In re PAUL et al.

S. L. LESZYNSKY & CO. v. EWING.

(Circuit Court of Appeals, Ninth Circuit. August 4, 1919. Rehearing Denied October 14, 1919.)

No. 3254.

BANKRUPTCY ⬤⟳178(1)—PROVABLE CLAIMS—SECURED CREDITOR—FRAUD.

A transaction between bankrupts, a mercantile partnership then in financial difficulty, and a creditor, by which the latter obtained the claims of other mercantile creditors at a large discount and took bankrupt's notes for the full amount, secured by chattel mortgage and afterward by bill of sale, with an agreement of repurchase, *held* not fraudulent as to bankrupts or other creditors, and such creditor's claim, after crediting the value of the mortgaged property, *held* provable against the estate.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

In the matter of Joseph Paul and Samuel Paul, bankrupts. S. L. Leszynsky & Co. appeal from an order sustaining objections of Edwin C. Ewing, trustee, to allowance of its claim. Reversed.

See, also, 236 Fed. 811.

Leszynsky & Co., a corporation, appeals from an order of the District Court, affirming an order of the referee in bankruptcy disallowing an unsecured claim of the appellant proved in bankruptcy proceedings. The debt having been secured, the claim was proved for the balance thereof after deducting the value of the security, which had previously been determined by the District Court. The trustee in bankruptcy of Joseph Paul and Samuel Paul, bankrupts, filed a petition to disallow the claim. The referee sustained the petition of the trustee and overruled the appellant's objections to certain other claims.

The referee found substantially as follows: That the claims of Selig Paul, A. W. Kaplan, and A. S. Weguson should be allowed; that Leszynsky & Co. filed its claim against the bankrupts for $19,933.31, made up of two items, $12,567.62 in a promissory note secured by "an alleged chattel mortgage on a stock of goods which was at the time of the filing of the petition in bankruptcy, in the possession of said claimant," the value of which security has been, since the adjudication in bankruptcy, determined by order of court at $7,200; also an item on open account for $7,365.69 for merchandise furnished subsequent to the execution of the note just referred to. It is found that in the spring of 1912 bankrupts owed, in addition to the amount due claimants Paul, Kaplan, and Weguson, various creditors about $12,476.11, of which sum $2,195.83 was due to Leszynsky & Co.; that the bankrupts and Leszynsky negotiated with a view of arranging a loan to be made by Leszynsky & Co. to the bankrupts with which to settle with other creditors, the plan being to get settlement with all the merchandise creditors, except Leszynsky & Co., at the best figure that could be agreed upon and a sum advanced, together with

Leszynsky's claim in full, was to be secured by chattel mortgage upon the bankrupt's stock of goods; that afterwards in the negotiations Leszynsky & Co. was represented by one Kirske, who advised his principal of the developments of the plan, and that Leszynsky wrote to Kirske to have the bankrupts run down their stock as low as possible, converting the same into cash, as that would enable them to make a better settlement with the creditors.

It is also found that, after the bankrupts had conferred with the attorney for claimant, he sent out letters to the creditors, recommending a settlement by which the creditors agreed to accept 40 cents on the dollar in full satisfaction of their claims; that claimant, having put the bankrupts in a position of increased financial difficulties, then refused to advance the money necessary to pay the other creditors, unless the bankrupts would execute a note secured by a chattel mortgage for the full amount due claimant, together with the full amount due upon the claims of the other creditors, said accounts to be assigned to Leszynsky & Co. by the creditors upon settlement being made; that the bankrupts objected at first, but finally agreed, and on June 13, 1912, executed and delivered to Leszynsky & Co. their note for $12,476.11, secured by a chattel mortgage upon their stock of goods; that this sum represented the face of Leszynsky's claim, and of the assigned claims, together with a small sum for court costs and attorneys' expenses; that the real consideration for the note and mortgage was the sum then owing by the bankrupts to Leszynsky & Co., which was $2,195.83, together with the sum paid to creditors in settlement of their claims, $4,890.77.

The referee found that the chattel mortgage was given and taken in fraud of, and in attempt to delay and hinder, the creditors of the bankrupt; that Leszynsky & Co. paid the claims of creditors who had agreed to the settlement referred to, and assignments of the creditors' claims were made (except in one or two instances) by the attorneys for the creditors; that the purchase and assignment of the claims was a mere subterfuge to enable Leszynsky & Co. to press its advantage over the bankrupts, which had been secured by the earlier negotiations resulting in the letter to the creditors, and to give "some shade of justification to the contract, which had been wrung from the bankrupts, to repay approximately double the amount of their actual indebtedness to the claimant." The referee holds that the contract is usurious.

Further findings are: That, after the execution of the note and chattel mortgage referred to, Leszynsky & Co. took actual possession of the mortgaged property, and although the business was carried on in the name of the bankrupts, Leszynsky & Co. dictated the management and policy, kept a representative in the store, and had actual control; that the insurance policies were being canceled because of the existence of the chattel mortgage, and that when it was evident that the insurance could not be had on the stock while it was covered by a chattel mortgage, Leszynsky and the bankrupts agreed that a bill of sale should be made to claimant, and a contract providing for the repurchase of the property by the bankrupts should be given by Leszynsky & Co.; that thereupon a bill of sale was given to Leszynsky for a consideration of $1 and other valuable consideration; that the chattel mortgage was then satisfied of record and the bill of sale recorded, but that by agreement the contract for repurchase was not recorded; that the consideration named in the contract of repurchase was the same amount that was owing according to the terms of the note and chattel mortgage at the time of the release of the mortgage; that when the bill of sale was executed and delivered the value of the bankrupts' property transferred was $23,000, and the true consideration of the transfer was the money advanced by Leszynsky, $4,890.77, together with the full amount of the claims of that company, $2,195.83, less penalties provided for suit for usury, namely, $1,641.42, making the actual consideration $5,445.18.

It is found that the transfer of the bankrupts' property by the bill of sale was intended as a sale and transfer of the property and as an extinguishment of the first item ($12,567.62) in the claim of Leszynsky & Co.; that the second item named ($7,365.69) in the claim was not a charge against the estate of the bankrupts; that at the time of the delivery of the note and chattel mortgage and the bill of sale, Leszynsky & Co. knew of the existence of certain credi-

tors (Paul, Kaplan, Weguson, La France, and Litchman), and that the claims of those creditors were unpaid and unsecured; and that their claims were not included in the settlement of creditors made in pursuance of the agreement between the bankrupts and Leszynsky & Co.

As conclusions of law the referee held that the objections filed to the claims of Paul, Kaplan, and Weguson were without foundation, and that the petition to expunge the claim of Leszynsky & Co. should be granted.

Appellant contends that the District Court had no jurisdiction to investigate or decide with reference to the validity of Leszynsky & Co.'s lien rights under the chattel mortgage, or under the bill of sale, and that the court erred in holding: (1) That the transactions which culminated in the note and mortgage were fraudulent as to the creditors of the bankrupts; (2) that the transaction was usurious; (3) that the transaction by which the bill of sale given to Leszynsky & Co. by the bankrupts was an absolute transfer of the bankrupts' title to the property. Error is also assigned upon the refusal of the court to allow the claim of Leszynsky for the balance of the note, after applying in payment thereof the value of the property ascertained by the bankruptcy court as an unsecured claim, and in refusing to allow the claim of Leszynsky for merchandise sold to the bankrupts after the execution and delivery of the note and chattel mortgage.

John B. Clayberg, of San Francisco, Cal., and Preston, Thorgrimson & Turner, of Seattle, Wash., for appellant.

Jones & Riddell and Douglas & Schramm, all of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). We cannot find substantial ground in the record for upholding the position that the appellant "wrung" the contract of mortgage from the two Pauls. They were intelligent men, familiar with business affairs, and evidently had full sense of the embarrassments surrounding them, because of certain creditors' suits which were pending against them and the pressure for payment of their debts. They voluntarily sought relief, and for some weeks conferred with appellant, who was a creditor, with a view of arranging a plan under which they could get means and continue with their business. The agreement reached provided for a settlement with all merchandise creditors, such settlement to be had with funds to be loaned by appellant. Appellant's claim was to be paid in full, and for the amount of the appellant's claim and the amount advanced to pay other creditors a chattel mortgage was to be given by the Pauls to appellant, or to some one acting for it.

The controversy, in its acute phase, really narrows to the inquiry whether or not the agreement with the appellant was that it should take assignments for the claims, and whether the Pauls were to include in the note and pay the amounts represented by the face of the claims of creditors, and not the reduced amounts paid to the creditors under the settlement. Upon this matter the testimony of Paul was substantially as follows:

That appellant and its counsel said that the best they could do would be to take the amount of the money the bills would be, and take notes for the entire amount, and give him five years to pay, and if that was satisfactory they would go into the deal, and if not, that they would not advance the money; that he recalled to them their

previous letters and agreements, told them of the circular that had been mailed to the creditors, asking what offer they would accept, but that they said, if that was not satisfactory, to let it alone. Paul said he had "nothing to do but to accept," and that instead of taking the accounts they wanted a mortgage, and that they would confirm orders which would be advantageous upon the credit of Paul; that he agreed to the mortgage; that Leszynsky asked for a list of creditors that had not been heard from, and said that he was going to New York, and would tell creditors listed that appellant was to advance $5,000 to pay off creditors, and was going to accept the same percentage in settlement as the rest, and was going to give Paul five years' time to pay as per the original agreement. Paul also said that when the time came for the payment of the money he went to the office of Mr. Stern, and as he was paying out the money Stern had something drawn up that Paul knew nothing of, "but every time a man accepted money he had him sign a transfer of the account;" that the next afternoon he signed the mortgage; that on that same day Stern wanted to know about the new notes, whether they had been renewed; that he took them to Stern's office, and that Stern tore the signatures off the notes; that Leszynsky often said his idea was to put Paul on his feet again; that Leszynsky, before the mortgage, went over the accounts in the store; that he saw the accounts of the relatives of the Pauls; that after the execution of the mortgage business was carried on and the question of insurance arose. Inasmuch as the insurance companies would not carry a risk where there appeared to be a chattel mortgage against the property in the building insured, some action was necessary.

Paul testified that he called upon the agent of the appellant and was told that they had a bill of sale prepared which would enable the insurance matter to be adjusted; that he sent the bill of sale to his brother, who signed and returned it; that he himself told Leszynsky that if he signed the bill of sale appellant could put him out, and that Leszynsky referred to the poor business conditions in the country and "smoothed" things over; that witness signed the bill of sale and turned it over, and that appellant gave him back the agreement for repurchase; that the agreement between himself and appellant for repurchase was secret, and not recorded, appellant saying that it should not be recorded because they would not be able to get insurance if it were; that the value of the business at the time of the bill of sale was between $28,000 and $30,000. On cross-examination Paul said that during the negotiations he consulted with his attorney, and that the mortgage was submitted to him for his approval; that he saw the form letter prepared to creditors, and that it was satisfactory to his counsel and to himself; that he never knew that appellant wanted assignments of the claims until the day the money was paid out by appellant, which was just before the mortgage was made. Paul said of the mortgage:

"I agreed to it because I was forced to agree, not by threats of bodily harm, but by the option that Stern brought on by the torture and death of the business. I was taken totally by surprise when, at the time the money was to be disbursed, I found that Leszynsky wanted assignments of those claims."

Witness said that he never objected to the taking of the assign-ments at the time of the execution of the mortgage, and that so far as he knew at that time it did not make any difference to him, be-cause he would only have to pay the same amount in either case. Paul said that he had control of the business after the mortgage, and that he told the bookkeeper to open a new account for appellant for the first of the accounts; that he did all the buying, and appellant confirmed all orders; that he handled the money and saw that it was properly checked and deposited; that he and his brother drew sal-aries; that after the bill of sale was given he had as much to say about the business, but they paid no attention to it; that he wanted to apply $500 from collections and sales on the contract of indebted-ness; that when the original mortgage was made the amount secured included all the merchandise creditors, those who had signed up, as well as a few who had not. "We thought we could buffalo a few."

The testimony of Leszynsky was to the effect that he told the Pauls that the only way in which he could go into the transaction would be by buying the accounts and giving the bankrupts five years in which to pay him back the full face value of the accounts; that the mort-gage, which was made two months after his original talk, carried out that proposition and was satisfactory to the Pauls.

Mr. Ramey, who acted as attorney for the Pauls, testified that he examined the proposed chattel mortgage, and told Paul that the mort-gage contemplated would eliminate him in the right to have anything to say in the conduct of the business; that it was Paul's desire to gather everything into one indebtedness, payable at some sufficiently long distant time in the future, to be handled out of the business; that before the mortgage was drawn, at the office of Mr. Stern, who was counsel for Leszynsky, the terms discussed were that Leszynsky would pay all the claims of the creditors and take a note representing the total indebtedness so acquired; that Leszynsky was to get hold of all the claims and to have in their stead the mortgage and note; that the proposition was that the amount should be the sum advanced by appellant, and not the total of the open accounts, but whether this was afterwards changed he did not know; that he paid little attention to the amount put in the mortgage, because Leszynsky would have the same hold over Paul, no matter what amount was inserted in the instrument.

Miss Casey, cashier and bookkeeper in Seattle for appellant, said that, after the bill of sale was made, the operation of the business went on just the same as it had under the mortgage, with the excep-tion that it was taken out of her name, and put in the name of A. S. Kirske; that everything was to be carried on the same in the matter of indebtedness evidenced by the chattel mortgage, and that the note which the chattel mortgage secured was not surrendered at the time the bill of sale was executed, so far as she knew; that after the bill of sale was made Leszynsky kept supplying goods to the store, and that orders had to be signed by appellant.

Stern, who was counsel for Leszynsky in the transaction, testified that Paul agreed to the proposition that Leszynsky should buy the

claims of other creditors; that it was understood that if the business profited Leszynsky would make the difference between the face of the claims and the actual amount paid for them; that Paul was perfectly satisfied and anxious to consummate the matter; that Paul said some of his relations had claims, but that they would abandon them or cancel them, so as to give him a chance to work out the plan of appellant, and that the relations' claims need not be considered in computing the amount Leszynsky had to invest; that when the insurance difficulty came up Paul and Kirske said that an insurance agent had advised that the business be transferred absolutely to Leszynsky & Co. on record; that appellee and Kirske discussed the legal phases of the matter, and that he told them he thought it would be safe to make a bill of sale, and that the indebtedness was still to stand between Leszynsky and the Pauls as represented by the original note; that the business was to go on just the same, and that the Pauls were to pay just the same amount as they were to pay under the mortgage, the same installments, and the same interest and terms; that Paul said he would like a writing to show that there was no change in the amounts they were obligated to pay in order to get the business back; that witness then drew an agreement whereunder appellant agreed that, when the payments and installments were made as provided in the agreement, Paul was to have the business back.

Again referring to the claims of certain relatives of the Pauls, Stern testified that Leszynsky said he did not wish those claims outstanding and to be asserted against the business, and that Paul said they were close relations, and that he would see that they did not assert their claims, or make any attempt to get payment, until he was through with his arrangements with appellant and was on his own feet. It was understood that the claims of relatives were in the form of notes, whereupon Stern advised Paul to secure the notes; that thereafter Paul brought the five or six notes signed by Kaplan, and that witness tore off the signatures and put them in his files; Stern testified positively that Paul and he discussed the question of assignments a number of times before the mortgage was executed, and that the intention of the parties in the drawing and execution of the bill of sale was not to vary the rights that existed prior to the instrument, and that the purpose was to permit appellant to control the business as it had controlled it during the time of the mortgage, and to give the Pauls the same rights they had had, namely, upon the payment of certain sums in certain installments they were to regain their business, and thus permit the securing and retaining of insurance on the business.

Kirske, representative of Leszynsky & Co., also says that the agreement was that Leszynsky & Co. would pay the accounts, 30 or 40 cents on the dollar, and that Paul would give notes and mortgages to cover the full amount that he owed the creditors; that Leszynsky & Co. should buy the creditors' claims, and that Paul would then pay Leszynsky & Co. the amount in full that he owed creditors, and would give notes running five years, secured by a chattel mortgage; that when the notes and the mortgage were given he told Paul that he had

better get back the notes made to his relatives—one to a brother-in-law, another to his father-in-law, and one to his father—and Paul said he would get them and have them canceled, but that they would not bother at all. Witness said that he saw the notes in Stern's office; that the mortgage was made in favor of Miss Casey, and that after its execution the Pauls were put in the store on salaries; that he and Miss Casey were to countersign checks, and all goods were to be bought upon orders signed by Miss Casey and himself; that an agent of the insurance company advised the bill of sale transaction, and that after it was executed insurance was adjusted, and that there was no other purpose in the bill of sale, except to effect insurance; that after the bill of sale things were conducted as they had been under the chattel mortgage—that is to say, appellant was in possession and practically in charge of the business.

The finding of the referee, that at the time of the execution and delivery of the chattel mortgage, and also of the bill of sale, the appellant knew of the existence of the creditors, Selig Paul, A. W. Kaplan, and A. S. Weguson, and that the claims of such creditors were wholly unpaid and unsecured, but that said creditors were not included in the settlement made in pursuance of the agreement between the bankrupts and Leszynsky & Co., appears to be against the weight of the evidence as furnished by the books of the Pauls. In a statement of the business offered by the trustee, compiled and certified by a public accountant, as of December 31, 1912, showing assets ($32,479.53), and liabilities, and capital appears these items: To Weguson, $1,000; S. Paul, $500; J. & S. Paul, $7,979.85; A. W. Kaplan, $5,427.70—due as capital investments, as were the amounts due to J. & S. Paul, other members of the National Outfitting Company. In this same statement the entire indebtedness of the copartnership was presented in "Bills Payable" and "Accounts Payable" —bills payable being $12,475.61, which is the exact amount (with the exception of an apparent discrepancy of 50 cents) of the promissory note given to Leszynsky & Co. and secured by the chattel mortgage. In accounts payable, all other indebtedness, except where in the form of a written obligation, seem to have been included. Furthermore, in the trial balances of the Pauls from June, 1912, to and including February, 1914, there appeared an account in favor of Weguson for $1,000, Selig Paul for $500, and up to and including December, 1912, A. W. Kaplan, $6,330.10, thereafter reduced to $5,427.70. In these trial balances the account of bills payable was credited for December, 1912, and January, February, March, and April, 1913, with $12,476.61.

Miss McComb, the bookkeeper for the Pauls, testified that the names of Weguson, Kaplan, and Selig Paul did not appear in the bills payable account, although they may have been in a sort of memorandum, and that in the transfer ledger the names of these three parties did not appear at the time the mortgage was given as bills outstanding. She also testified that in 1910 Kaplan's account was credited on the books for his "proportion of the profit" in proportion to the money "invested by him." In 1911 his account was also treated in

the same general way, and that the entries were made by direction of Mr. Paul. Miss McComb also said that the Weguson and Selig Paul accounts were placed on the books in the same way and form as the account of Kaplan, and that since the appellant had become interested in the business no interest had been paid on any of these three accounts. Miss Casey said that, when these accounts appeared in the trial balances, Mr. Paul told her they were loans from relatives or friends in the nature of an investment. Joseph Paul said that Selig Paul was his father, Weguson his father-in-law, and Kaplan his brother-in-law. He denied that he ever told Leszynsky that the obligations to these relatives would be canceled, but said that, when he and appellant were negotiating, he took the notes due to these relatives to the office of Mr. Stern, to show Mr. Stern that the notes were "renewed," and that he told Stern that he had given new notes to his relatives, and that the obligations were to stand. Stern tore off the signatures to the notes and kept them. Miss McComb testified that there never had been any interest paid upon the notes due the several relatives. We naturally express surprise that Paul should have been willing to take the notes to Stern and deliver them up for cancellation, unless it was in accord with an agreement for cancellation of them, and that Leszynsky & Co. might be assured that they would not embarrass the transaction between the Pauls and Leszynsky.

The record evidence, when considered with the uncontradicted oral testimony, leads us to conclude that the referee and the lower court were in error. Our opinion is that it is proven that the contract made between the Pauls and appellant corporation about June 13, 1912, which was the date of the note and chattel mortgage, was that the appellant would purchase and take assignments of the claims of other merchandise creditors, and that the note to be secured by chattel mortgage to be given by the bankrupts should be for the full face value of these claims and the debt due to the appellant corporation. We must also hold that the evidence shows that, while appellant went into possession of the property mortgaged, the business was run by and in the name of the bankrupts, as it had been before the execution of the mortgage. The bankrupts collected the debts and paid the expenses of the business. It is also to be concluded that about April 12, 1913, it was agreed that the chattel mortgage should be canceled of record, and that a bill of sale should be executed by the bankrupts to the representative of the appellant corporation, and that appellant should execute and deliver to the bankrupts, to protect their interests, an agreement providing for right of repurchase upon payment by the bankrupts of the amount of the note in accordance with the terms of the contract.

As against the creditors and the bankrupts we find no fraud is shown, and the insurance companies are not before us complaining of any possible wrong done to them in taking out policies in the name of Kirske as owner. The Pauls asked financial aid from appellant. They were fully advised by counsel, and entered into the contract with appellant, knowing that it would mean the payment of their

notes to appellant in full. At the time they evidently believed that they could keep their business, establish credit, and pay out in the postponed time fixed. Appellant accepted the statements that the entire indebtedness was presented in "bills payable" and "bills receivable," and was assured that the relatives were not creditors. The very large, if not unconscionable, profit to accrue to appellant under the contract, does not warrant the conclusion in this proceeding that the contract as written did not express the real intention of the parties, and the court in bankruptcy has no power to relieve the bankrupts from the terms of the agreement as it was deliberately entered into.

As the rate of interest fixed in the notes was less than 12 per cent., and the mortgage was given for no greater amount than was due, the question of usury under the state statute does not arise.

It appears that after the bill of sale transaction the business was continued in the same manner as before. It was run in the name of the bankrupts; they collected the debts, paid the expenses, and made a payment on the note out of the proceeds of the business. The bill of sale and the contract connected therewith must therefore be considered as a security in the form substituted for the chattel mortgage. The claim of Leszynsky & Co. upon open account for merchandise sold after the execution of the bill of sale was valid, and ought to have been allowed and approved, and appellant's claim for the balance due on the notes, after applying the value of the property as determined by the court, should have been allowed and approved.

The order of the District Court is reversed, and the cause remanded, with directions to make such orders as will carry out the views we have expressed.

Reversed.